**Michelle FISHER and Matthew Fisher,**

v.

**WALSH PARTS & SERVICE COMPANY, INC., American Gage and Machine Co., Walsh Press Company Inc., Katy Industries, Inc., Walsh Press & Die Company and WP Liquidating Corp.**

No. CIV.A.01–CV–6604.

United States District Court, E.D. Pennsylvania.

June 24, 2003.

Michael Fanning, Peter M. Patton, Sandra W. Morris, Galfand Berger, LLP, Philadelphia, PA, for Plaintiffs.

Eric M. Hurwitz, Stradley Ronon Stevens & Young LLP, Richard W. Foltz, Jr., Pepper Hamilton LLP, Bradley D. Remick, Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

SMITH, United States Magistrate Judge.

### FACTS AND PROCEDURAL BACKGROUND

Plaintiffs, Michelle Fisher and her husband Matthew Fisher, brought the instant action against Walsh Parts & Service Company, Inc., American Gage and Machine Co., Walsh Press Company, Inc., Katie Industries, Inc., Walsh Press & Die Company and WP Liquidating Corp. ("Defendants"), seeking damages for injuries she sustained while using Defendant's product, a Walsh mechanical power press, model No. 38MC, serial No. 12153[1]. Plaintiffs bring this product liability case, alleging that defendants are legally liable for damages under the Restatement (Second) of Torts § 402A and/or as a result of negligence, as well as for a loss of consortium. Defendants have filed a Motion for Summary Judgment. For the reasons which follow, said motion will be denied.

The action arises from injuries Plaintiff Michelle Fisher sustained while she was employed by International Peripheral Systems ("IPS"), which manufactures mail cancelling machines. Plaintiff began

---

1. Since the filing of this Motion the parties have filed a Stipulation agreeing that Katy Industries, Inc. has assumed liabilities for design, manufacture and sale of the subject Model 38 Walsh press as if Katy Industries, Inc. had designed, manufactured and sold the subject Model 38 Walsh press itself. It does not appear however that the parties have not however agreed to dismiss the remaining defendants and no motions have been filed.

working at IPS in February 1999 and in September 1999, during the course of her employment, was assigned to use the Walsh press. She used the press the first day without incident, but the next day she used the press, September 20, 1999, she sustained injuries resulting in the loss of her middle and ring fingers from the top two knuckles up.

IPS used the press to punch holes or stamp out small metal parts. There were two buttons that had to be pressed simultaneously to cause the press to come down and form the desired piece out of brass that was placed under the die of the press. (Heyda 9/17/02 dep. at 28) (M. Fisher 6/19/02 dep. at 27). After the piece was formed, plaintiff reached in by hand to remove it. The operator would also have to place the next piece of metal to be stamped. (M. Fisher 6/19/02 dep. at 27). As the press was being operated in single stroke or non-repeat mode, rather than continuous mode, it was not supposed to cycle again until the two buttons were once again pressed. (Heyda 9/17/02 dep. at 28). However, while plaintiff was using the press on September 20, 1999, she reached in to get the piece and the press "repeated" causing serious injury to her hand.

Mr. Heyda, Defendants' corporate designee, testified that the latch bracket assembly, part of the non-repeat safety system, was secured to the press by two hexagon bolts with split lock washers to secure the bolts. He also testified that a safety wire went through holes in the two bolts and was twisted together. (*Id.* at 87–88). This wire was not listed on the original parts list. (*Id.* at 106). Mr. Heyda testified that if the bolts became loose, the press would go into continuous mode and there would be a catastrophic failure. (*Id.* at 93).

After plaintiff's injury, the press continued to cycle until Charles Ross turned it off with a key. (Ross 6/11/02 dep. at 14, M. Fisher 6/19/02 dep. at 47). Testing performed by IPS after the accident showed that the press continued to cycle without the two buttons being pressed. (Briggs 6/6/02 dep. at 57). Further inspection of the press revealed that the two hexagonal bolts on the press were loose and the bracket was backing off the frame of the press. No safety wiring was observed at the time of the inspection after the accident. (*Id.* at 70). The Supervisor of the IPS Machine Shop, John C. Briggs, also was not sure whether at the time of inspection there were lock washers, but believes there may have been a flat washer. (*Id.* at 71). Mr. Briggs testified that after the accident and the initial testing and inspection of the press he was instructed to destroy the press or make it non-operational. (*Id.* at 81).

According to a purchase order, the press that was used at IPS was originally sold by Defendants in 1976 to Chambers, Bering, Quinlan Company. IPS then purchased the press approximately eleven years later, in 1987, from an unknown machinery dealer. (Jiranek 6/11/02 dep. at 8). Jerome W. Heyda testified that no machine would have been permitted to leave Walsh without the hexagonal bolts being wired. (Heyda 9/17/02 dep. at 89). The press also had the following warning on two plates, one above the bolster and one below it:

DANGER DO NOT ENTER DIE SPACE UNLESS SLIDE IS BLOCKED AND FLYWHEEL IS AT REST.

IN THE EVENT OF FAULTY OPERATION, DO NOT USE PRESS UNTIL IT IS FUNCTIONING PROPERLY.

CARE SHOULD BE TAKEN THAT PRESS IS PROPERLY ADJUSTED AND MAINTAINED AT ALL TIMES.

There is no evidence as to who owned the press from 1976 to 1987. The press was

however, apparently damaged when IPS purchased it. (Briggs dep. at 31). According to the testimony of IPS employees, IPS made several repairs to the press, without ordering any parts from defendants. The first repair was to the latch rod, which was weld-repaired (Jiranek 6/11/02 dep. at 24–25). The second repair involved replacing a broken shaft with one made by IPS. (Ross 6/11/02 dep. at 11). In August of 1999, John Briggs rebuilt the electropneumatic valve in the press with a repair kit that was not manufactured by defendants. (Briggs dep. at 26)[2]. In addition, Mr. Ross testified that he may have removed the flywheel to replace springs. (Ross 6/11/02 dep. at 12).

As a result of the repairs, Defendants claim that the accident was caused by the failure of an unknown person or persons, having removed the hexagonal bolts holding the latch assembly bracket, to resecure them using lock washers and safety wire and that these substantial changes in the condition of the press relieve defendants from liability. The parties agree that the press did not contain any warning against repairing with parts not manufactured by Walsh and that Walsh did not have a service department. (Heyda dep. at 100). Defendants also move to prohibit plaintiff's expert from being permitted to testify at trial.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to judgment as a matter of law." FED R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 463–464 (3d Cir.1989). A factual dispute is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For there to be a "genuine" issue, a reasonable factfinder must be able to return a verdict (or render a decision) in favor of the non-moving party. *Id.*

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *Boyle v. County of Allegheny, Pennsylvania*, 139 F.3d 386, 393 (3d Cir.1998). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

Once the movant has carried its initial burden, Rule 56(e) shifts the burden to the nonmoving party as follows:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits

---

**2.** Although page 26 of Mr. Briggs' deposition testimony was referenced by defendants as being attached as Exhibit D to their brief, this page was not attached as an exhibit to either brief in this case. However, given that plain-

tiffs did not object to this assertion by defendants we will assume for purposes of this motion that this statement accurately portrays Mr. Briggs' testimony.

or as otherwise provided in this rule must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party. FED. R. CIV. P. 56(e). However, to raise a genuine issue of material fact " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proferred by the movant,' but simply must exceed the 'mere scintilla' standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir.), *cert. denied*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Summary judgment may be granted only if, after viewing all evidence in the light most favorable to the non-movant, no jury could decide in that party's favor. *Tigg Corp.*, 822 F.2d at 361.

## DISCUSSION

Defendants argue that the fact that IPS made repairs to the press, which they claim were substantial changes which were not foreseeable by Defendants, relieves them of any liability under both negligence and strict liability. They assert that the press was not defective when it left Walsh but was only made defective by changes made after it left its control.

Given that jurisdiction in this action is based upon diversity, we must apply Pennsylvania products liability law. *Pavlik v. Lane Ltd., Tobacco Exporters Int'l.*, 135 F.3d 876, 881 (3d Cir.1998). The Pennsylvania Supreme Court, has adopted Section 402A of the Restatement (Second) of Torts, which imposes strict liability in products liability actions. *Id.* The section provides as follows:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The Courts have held that "a manufacturer may be relieved of liability only if: (1) the product was substantially altered after it left the manufacturer's control; (2) the modifications were not foreseeable to the manufacturer; and (3) the changes to the product were a superseding cause of the user's injury." *Hoffman v. Niagra Machine and Tool Works Co.*, 683 F.Supp. 489, 493 (E.D.Pa.1988). The seller is not liable if a safe product is made unsafe by subsequent changes. *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 899 (1975).

■ The first issue is whether the product was substantially altered after it left defendant's control. Once it has been determined that the product was substantially altered, the question becomes whether the manufacturer could have reasonably foreseen or expected such an alteration. *Davis v. Berwind Corp.*, 433 Pa.Super. 342, 640 A.2d 1289, 1295 (1994), *aff'd* 547 Pa. 260, 690 A.2d 186 (1997). The issue of foreseeability is measured as of the date of the product's sale. *Rooney v. Federal Press Co.*, 751 F.2d 140, 143 (3d Cir.1984). "If the alteration should have been reasonably anticipated by the seller, it would be a 'substantial change' within the meaning of § 402A only if it were negligently or improperly implemented." *Kuisis v. Bald-*

win–Lima–Hamilton Corp., 457 Pa. 321, 319 A.2d 914, 922, n. 15 (1974). Finally, the change must also be the superseding cause of the plaintiff's injury. This causation requirement has been held to be applicable to both negligence and strict liability claims. Eck v. Powermatic Houdaille, 364 Pa.Super. 178, 527 A.2d 1012, 1020 (1987); Schreffler v. Birdsboro Corp., 490 F.2d 1148, 1154 (3d Cir.1974).

The Third Circuit has noted that in Pennsylvania, the question of whether a post-delivery modification constitutes a substantial change has typically been submitted to a jury for its determination. Merriweather v. E.W. Bliss Co., 636 F.2d 42, 44 (3d Cir.1980), citing e.g., Takach v. B.M. Root Co., 279 Pa.Super. 167, 420 A.2d 1084 (1980); D'Antona v. Hampton Grinding Wheel Co., 225 Pa.Super. 120, 310 A.2d 307 (1973). The Court in D'Antona v. Hampton Grinding Wheel Co., 225 Pa.Super. 120, 310 A.2d 307 (1973) stated that the determination of whether the manufacturer could have foreseen such an alteration is also a question to be resolved by the fact finder "unless inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." D'Antona, 310 A.2d at 310.

▆ In this case, Jerome Heyda testified that at the time the press was sold he personally inspected all presses to be certain that the lock washers and safety wire were present before they were shipped. (Heyda dep, Ex. H at 87–89). It seems to be undisputed that the safety wire and possibly the lock washers were removed after the press left the manufacturer and that their removal was a substantial modification [3]. In addition, the parties agree that the accident was caused by the hexagonal bolts backing off. It therefore may be possible that the removal or absence of these devices, which were intended to secure the bolts, may have been the cause of plaintiff's injuries. However, the issue as to whether repairs requiring removal of the safety wire and bolts were foreseeable at the time the press was sold remains in dispute.

Mr. Heyda testified that maintenance requiring removal of the bolts was not foreseeable at the time of sale. In addition, defendants claim that the presence of the wire was sufficient to signal that it needed to be replaced. Defendants claim that even if a repair was foreseeable any repair done without replacing the safety wire and the lock washers was negligent, releasing them of any liability. However, plaintiff's expert testified that such a repair was foreseeable given Mr. Heyda's testimony regarding the extended useful life of the press. In addition, plaintiff's rely upon the fact that there was no reference to the safety wire in any of defendant's literature and it was not on the parts list. In light of this dispute, we find that this issue is not so clear as to be able to resolved on summary judgment and should be resolved by the fact finder. While, we acknowledge that this case is not set for a jury trial, this Court, acting as fact finder must still have the benefit of hearing testimony prior to resolving this issue.

## IMPROPER WARNINGS/FAILURE TO WARN:

Defendants also claim that they are entitled to summary judgment finding that the warnings contained on the press were sufficient to prevent the injury sustained by plaintiff. Once again, we will decline to grant defendants motion on this basis.

---

**3.** As previously stated, Mr. Briggs is not certain whether the lock washers were present at the time of his inspection after the accident, but does not remember seeing them. (Briggs 6/6/02 dep. at 71).

Under Pennsylvania law and Section 402A of the Restatement (second) of Torts, an otherwise safe product can be deemed "defective" for strict liability purposes if it is distributed without adequate warnings to notify the user of the dangers inherent in the product. *Davis v. Berwind Corp.*, 690 A.2d at 190; Restatement (Second) of Torts 402A. A plaintiff must establish that the absence or insufficiency of a warning was the cause-in-fact and the proximate cause of the injury. *Conti v. Ford Motor Co.*, 743 F.2d 195, 197 (3d Cir.1984), *cert denied* 470 U.S. 1028, 105 S.Ct. 1396, 84 L.Ed.2d 784 (1985). "To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that the existence of an adequate warning might have prevented the injury." *Pavlik*, 135 F.3d at 881, *citing Conti v. Ford Motor Co.*, 743 F.2d at 197. Under Pennsylvania law, there is a rebuttable presumption that if an adequate warning had been provided it would have been heeded. *Pavlik*, 135 F.3d at 881.

Plaintiffs claim that the lack of a warning on the press regarding the necessity of replacing the safety wire and the lock washers on the hexagonal bolts and/or using only parts secured by Walsh rendered the press defective. Given the fact that the parties agree that the cause of the injury was the backing off of the bolts, which was supposed to be prevented by the safety wire and lock washers, it certainly seems that such a warning might have prevented the injury. However, defendants claim that they are entitled to summary judgment because the warnings contained on the press were adequate and if they had been heeded would have prevented the injury.

The press contained the following warning:

DANGER DO NOT ENTER DIE SPACE UNLESS SLIDE IS BLOCKED AND FLYWHEEL IS AT REST.

IN THE EVENT OF FAULTY OPERATION, DO NOT USE PRESS UNTIL IT IS FUNCTIONING PROPERLY.

CARE SHOULD BE TAKEN THAT PRESS IS PROPERLY ADJUSTED AND MAINTAINED AT ALL TIMES.

Defendants claim that plaintiff failed to heed the warning stating "DO NOT ENTER DIE SPACE UNLESS SIDE IS BLOCKED AND FLYWHEEL IS AT REST" and that this warning should have been sufficient to prevent plaintiff from placing her hand under the press. However, it is clear that due to the fact that plaintiff was operating the press in the anti-repeat mode, she had no reason to believe that the flywheel was not at rest. Even Mr. Heyda testified that someone operating in the non-repeat mode would have a false sense of security and be taken completely off guard if the press failed and went into continuous mode. (Heyda 9/17/02 dep. at 63).

This case is easily distinguished from *Davis v. Berwind Corp.*, 547 Pa. 260, 690 A.2d 186 (1997), upon which Defendants rely. In that case the plaintiff was injured when reaching into the opening of a blender when the blade continued to turn after she turned off the power. Plaintiff's employer had removed interlocking safety devices from the blenders in order to allow more than one blender to be operated at the same time. The blender contained a warning which stated "DANGER, KEEP FINGERS OUT OF DOOR OPENINGS". When analyzing plaintiff's strict liability claim the court held that the warning was sufficient to warn plaintiff and that her employer had removed an "integral" safety feature despite the fact that the manual

cautioned against it. *Davis v. Berwind,* 690 A.2d at 190. In the present case, the warning specifically cautioned against entering the die space unless the side is blocked and *the flywheel is at rest.* In contrast, the warning in *Davis* was a general warning to keep fingers out of the door openings. In addition, there is certainly no evidence in this case of safety devices being intentionally removed or disabled and no warning contained in a product manual regarding the devices.

Defendants also assert that the portion of the warning stating "CARE SHOULD BE TAKEN THAT PRESS IS PROPERLY ADJUSTED AND MAINTAINED AT ALL TIMES" was adequate to warn IPS to tighten the bolts and replace the safety wire. Once again, we are unable to find as a matter of law that IPS or a prior owner failed to heed this warning or that if heeded it would have prevented the injury. The issue of whether the repairs made to the press by IPS or a prior owner were negligent, i.e., whether they should have known to replace the safety wire and to use lock washers to secure the hexagonal bolts, remains. We therefore conclude that this issue is not appropriate for summary judgment at this time.

ADMISSIBILITY OF EXPERT TESTIMONY:

■ Finally, defendants also seek to exclude the testimony of plaintiffs' expert, Howard Sarrett, P.E., alleging that his opinions do not meet the standards for admissible expert testimony under Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 of the Federal Rules of Evidence governs the testimony of expert witnesses and provides that such testimony is permitted if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R. Evid. 702. Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit. *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000).

■ Pursuant to Rule 702, the Court must first examine whether the witness is qualified by virtue of "specialized knowledge" regarding the area of testimony. "The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'" *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir. 1998). The Court has interpreted the specialized knowledge requirement liberally. *Id.* The Third Circuit found that it would be an abuse of the trial court's discretion to exclude testimony "simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *In re: Unisys Savings Plan Litigation,* 173 F.3d 145, 170 (3d Cir.1999), *cert denied Meinhardt v. Unisys Corp.,* 528 U.S. 950, 120 S.Ct. 372, 145 L.Ed.2d 290 (1999). However, "at a minimum, a proffered expert witness ... must possess skill or knowledge greater than the average layman...." *Waldorf v. Shuta,* 142 F.3d at 625, *quoting Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 114 (3d Cir.1987), *cert denied* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).

With regard to the second two factors, reliability and fit, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that the District Court is to act as "gatekeeper" to evaluate whether an expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2786. The Court in *Daubert* set forth several factors to assess the testimony of an expert, but noted that the inquiry was a flexible one. The factors

include (1) whether the methodology can be and has been tested, (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; and (4) whether the technique has been generally accepted in the scientific community. *Id. Daubert*'s gate keeping requirement was extended by the Court in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), to apply to "the testimony of engineers and other experts who are not scientists." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. at 141, 119 S.Ct. at 1171. The requirements apply "not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." *Id.* When considering non-scientific expert testimony, the district court may consider one or more of the factors set forth in *Daubert,* when doing so will help determine the reliability of the expert. *Id.*

 Specifically, defendants allege that Mr. Sarrett lacks any specialized knowledge with respect to power presses. They argue that while working as a practicing engineer he at times dealt with the tooling of a power press, but he has never been trained in the repair of power presses, designed a power press or worked for a company that designed or serviced a power press. In addition, defendants claim that because Mr. Sarrett has never tested or seen a Walsh 38 press operate, he is not sufficiently qualified to testify.

As plaintiffs note, Mr. Sarrett is a licensed professional engineer with over 40 years of experience in mechanical engineering. He is the author or co-author of 200 reports and documents on matters of safety and machine design. Since 1999 he has been engaged as a consultant in safety and engineering and has served as an expert in other matters involving presses. (Sarrett CV). He has also reviewed his-

torical documents on power presses, power press regulations and power press standards and has reviewed the design of a number of other power presses. (Sarrett dep. at 43). The fact that he has not seen the Walsh 38 press in operation is due to the fact that the press at issue was destroyed by IPS and when Mr. Sarrett went to Walsh, none were operational. He has reviewed the literature available and certainly possesses more knowledge regarding the press and safety design than the average lay person. While Mr. Sarrett has never seen the particular type of press involved in this case in operation, we find that given Mr. Sarrett's experience and qualifications, he is certainly qualified to testify as an expert in this case, satisfying the first prong of this analysis.

We also decline to preclude Mr. Sarrett's opinions based upon Defendants' assertions that they do not "fit" the facts of the case. Defendants claim that Mr. Sarrett's claim that there is no evidence that when the press left Walsh the latch assembly bracket bolts had lock washers is contrary to the uncontroverted testimony of Mr. Heyda. However, as plaintiff's state in their response, Mr. Sarrett did not offer that opinion. Instead, he stated that there was no evidence that the wire and bolts were present when the press was received by IPS, which given the fact that there was at least one prior owner, does not seem to be contrary Mr. Heyda's testimony that they were present when the press left Walsh. As Mr. Sarrett stated, there is no evidence in the record as to whether they were removed before the press was purchased by IPS.

 Defendants also claim that Mr. Sarrett's assertion that it was possible for the bolts to back out of the latch assembly bracket even with the wire and washers on them, is not supported because he has no test results or data to demonstrate the

possibility. Mr. Sarrett actually testified as follows:

> I have not seen any diagram of the wiring intended, nor any specification on the safety wire to be used. Given that caveat, I am unable to tell whether or not proper wiring could properly, now being in quotations, safely lock or securely lock the bolts in place. It is quite possible for the wiring to shift and to permit rotation of the bolt.

(Sarrett dep. at 75).

He testified that he had not conducted any tests to determine what vibration was transmitted to the bolts, and when asked about his statement that the bolts backed out in a predictable fashion, he further testified that "[i]t's predictable that bolts become loose under conditions where they are subject to mechanical vibration. When they are not positively retained in place, it is predicted they were loosened." (Sarrett dep. at 76). Mr. Sarrett's testimony seems to indicate that he simply does not know whether the bolts could have become loose, but never having seen the safety wire or its specifications, that due to the fact that the machine vibrates, he believes it to have been possible.

Finally, defendants object to Mr. Sarrett's opinion that it was foreseeable that the safety wire would be removed during maintenance and that it would not be replaced. Mr. Sarrett explained that given the useful life of the press, which was described as being so long that nobody has lived long enough to determine it, it was likely that repairs would be made which would require removal of the wire. He also explained that his finding that it is foreseeable that the wire would not be replaced is based upon the fact that while Walsh initially recognized the need to properly secure the hex bolts, it took no steps to ensure the two bolts remained wired or that the two lock washers would remain in place during the useful life of

the press. This statement is consistent with the fact that the safety wire was not listed on the parts list. Given that Mr. Sarrett is able to explain the basis for his findings with facts in the record we decline to find that his opinions do not "fit" the facts of the case.

■ Defendants finally argue that Mr. Sarrett's opinions should be excluded because they do not satisfy the *Daubert* test and are scientifically unreliable. Defendants rely upon the Third Circuit's decision in *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir.2000), *cert denied*, 532 U.S. 921, 121 S.Ct. 1357, 149 L.Ed.2d 287 (2001), in which the Court held that an expert's opinion was properly excluded where he had not relied upon any testing, "used little, if no methodology beyond his own intuition", and where no standards controlled his analysis. *Id.* at 158. Defendants argue that Mr. Sarrett's opinions should also be excluded because "he failed to conduct any tests or calculate relevant forces, such as the type and amount of vibration that would be necessary to back up the bolts notwithstanding the two security measures to keep them secure on the machine—despite his assertion that this was 'possible'". Defendants also seek to exclude Mr. Sarrett's opinions regarding suggested changes to the press because he never conducted testing on a Walsh 38 press and has never seen one operate. In addition, they claim that Mr. Sarrett's opinions that the warnings were inadequate are improper since he sets forth no substitute warnings and points to no authority mandating additional warnings.

As plaintiffs argue, Mr. Sarrett asserts that his opinions are based upon his inspection of exemplar Walsh 38 power presses, photographs of the subject press, Walsh diagrams, as well as information from Walsh and IPS, including the accident report. He relied upon his review of

engineering literature of the press, as well as press industry material as an example of bolts backing out of a press and alternate designs. With regard to his opinion regarding the bolts possibly backing off due to vibration, plaintiffs assert that he relied upon his education and basic engineering principles, as well as his experience in accident investigation and machine design. In addition, he referenced a recall letter from a different manufacturer, E.W. Bliss, which recommended use of a "stop pin" and monthly inspections to prevent excessive lateral movement or loosening of bolts during use of a press. (Sarrett Affidavit). He also reviewed materials, including specific published industry articles regarding machine guarding to demonstrate guards used on presses which are the same type as the Walsh 38. (Sarrett Affidavit). In plaintiffs' supplemental response to interrogatories, they state that Mr. Sarrett may offer an opinion that Walsh failed to provide sufficient instructions and/or warnings concerning repair of the anti-repeat mechanism of the machine. It further specifies that "for example, Walsh did not instruct that after the removal of the latch bracket by removing the aforesaid bolts, that the bolts should then be rewired. In fact, Walsh's parts list for the aforesaid anti-repeat device, and the hex bolts in particular, do not depict the two bolts being wired together. The parts diagram for the subject press does not depict and/or address the bolt wiring at all." (Plaintiffs' Supplemental Responses to Interrogatories, response # 7 at p. 8). It seems clear from this response that Mr. Sarrett's proposed warning would include language regarding the necessity to rewire the bolts after removal.

The methodology relied upon by Mr. Sarrett greatly differs from that of the expert in *Oddi*. In that case the expert attempted to explain a basis for his suggested alternative design for a bread truck by stating that he had "studied" other bread trucks. *Oddi v. Ford Motor Co.*, 234 F.3d at 156. However, he was unable to state the name of the manufacturer of the other trucks or whether they were the same type as that involved in the case. He only stated that he saw them in a parking lot of a grocery store while he was shopping and did not take any notes. *Id.* He had also failed to consider the design of the guardrail which was hit in the accident in question. *Id.* at 157. In addition, in that case the expert's opinion that the bumper would have sustained the impact with the guardrail if it had been strengthened with either brackets or wedge supports and that the flooring in the occupant compartment should have been thicker or ribbed was based on nothing more than his experience as an engineer. The Court acknowledged that there may be instances where one's training and experience will provide an adequate foundation for an opinion, but found that this was not such a situation. *Id.* at 158.

In contrast, in this case Mr. Sarrett has stated that he has considered published articles and has studied and referenced specific manufacturers' presses even though he was not able to examine the press in question prior to it being destroyed. We do not find that Mr. Sarrett's opinions are based upon his subjective beliefs alone and therefore decline to exclude his testimony on this basis. The only opinion which appears to be supported by Mr. Sarrett's experience and training alone is his testimony regarding the possibility that vibration could have caused the bolts to back off even if the wire was present. However, given that he was not able to inspect the wire or its specifications, we will not exclude this testimony at this time. While we acknowledge that some of his conclusions may not be proven by the methodology relied upon, "the analysis of the conclusions themselves

is for the trier of fact when the expert is subjected to cross-examination." *Kannankeril v. Terminix International Inc.,* 128 F.3d 802, 806 (3d Cir.1997). As the Third Circuit has recognized, the test for admissibility does not require a party to demonstrate that its expert's opinions are correct, but rather whether it is based upon reliable methodology. *Id.*

Accordingly, the Defendants' Motion for Summary Judgment is denied.

### ORDER

AND NOW, this day of June, 2003, upon consideration of the Motion for Summary Judgment filed by defendants, Walsh Parts & Service Company, Inc., American Gage and Machine Co., Walsh Press Company, Inc., Katy Industries, Inc., Walsh Press & Die Company and WP Liquidating Corp., and the Response of plaintiffs Michelle Fisher and Matthew Fisher, it is hereby ORDERED that the Motion is DENIED.

It is so ORDERED.